IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville December 18, 2018

**TOMMY GAYDEN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 09-06131     Chris Craft, Judge

_____

**No. W2018-00787-CCA-R3-PC**
_____

The Petitioner, Tommy Gayden, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his conviction of second degree murder and resulting sentence of thirty years to be served at one hundred percent. On appeal, he contends that he received the ineffective assistance of trial counsel. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Vicki M. Carriker, Memphis, Tennessee, for the appellant, Tommy Gayden.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In September 2009, the Shelby County Grand Jury indicted the Petitioner for second degree murder. This court described the proof at trial as follows:

> This case relates to a shooting that resulted in the death of Monoleto Robinson. At the trial, Felicia Robinson testified that she and the victim were married but separated at the time of the shooting. She had eight children. She said the victim was an involved stepfather, even after they separated. She said the victim moved out of their home four months before

his death. She said she and the victim were listed as emergency contacts at her son's school. She said that she knew the Defendant as Tommy Dickerson and that they had an "on-and-off" relationship for fourteen years, which ended on February 26, 2009. She admitted that she and the Defendant dated while she was married to the victim, while she lived with the victim, and after the victim moved out.

Ms. Robinson testified that on February 26, 2009, around noon, she was in her bedroom with the Defendant, who had stayed at her home for a few days. She said she awoke that morning at 6:00, took her children to school, returned home, and went back to sleep. She said that at noon, the victim and her son knocked on the bedroom door. She said she put on her clothes and went outside through the living room door, which opened to the back of her home. She said the victim and her son were there because her son had been suspended from school. She told the victim that her brother was coming over and that they could walk to the front of the home and wait for her brother. She said the victim asked why they could not go inside. She told the victim that she had company.

Ms. Robinson testified that the victim took her keys from her purse and went into the home. She said she and her son followed the victim into her bedroom. She stated that she heard the victim say, "[B]---- ass n-----, are you pulling a gun?" She said that the Defendant stood in the doorway with a handgun and that the victim yelled and cursed at the Defendant. She said the victim stopped yelling and pushed her out the bedroom door. She said her son and the Defendant followed behind them outside the home. She said that the Defendant still had the gun in his hand, that the victim and the Defendant continued to argue, and that the victim told the Defendant what he was going to do to the Defendant if the Defendant put away his gun.

Ms. Robinson testified that the Defendant pushed the victim with one hand, that the Defendant "tumbled forward," and that the victim stumbled back and forth. She said that the Defendant had his back to the house when he pushed the victim and that the victim faced the house. She did not see anything in the victim's hand but said the Defendant still had the gun in his hand. She said that after the Defendant pushed the victim, the Defendant stood still, raised his arm straight, and shot the victim in the chest. She said the Defendant paused before pulling the trigger. She stated that the victim fell to the ground and that the Defendant went into the home. She said the Defendant came outside, saw the victim on the ground,

said, "[S]---, man," and walked down the sidewalk. She said the Defendant never yelled at the victim. She said that she performed CPR and that her son witnessed the shooting.

On cross-examination, Ms. Robinson testified that she and the victim married on October 6, 2006. She said that she and the victim separated several times during their marriage and that she and the Defendant dated during the separation periods. She said the victim worked as a security guard after they married. She said the victim weighed about 250 pounds and was 6'2" tall and agreed he was a former high school athlete.

Ms. Robinson testified that after she told the victim that she had company, the victim choked and shook her and grabbed her clothes. She did not recall the victim's calling her names but said it was possible that he did. She said the victim did not have a key to her home or permission to be in her home. She said the victim had permission to be there once a week to spend time with the children and agreed the day of the shooting was not his visitation day. She said that the Defendant had permission to be in her home and that he arrived two days before the shooting.

Ms. Robinson testified that while she, the victim, the Defendant, and her son were in the bedroom, the victim told the Defendant that the victim was going to "f--- him up" if the Defendant put down his gun. She interpreted the victim's statement to mean the victim would fight the Defendant but did not know if the victim meant he would kill the Defendant. She said that the victim was angry and that the Defendant stood still. She said the Defendant held the gun at his side with the barrel pointed toward the floor while the victim yelled. She said the Defendant's only statement to the victim while they were in the bedroom was that "it don't have to be like this." She interpreted the Defendant's statement to mean that there was a better way to handle the situation. She said the Defendant did not seem angry.

Ms. Robinson testified that the victim pushed her by the neck and shoulders out the bedroom door and yelled at her but denied that the victim threatened her. She said the victim let her go after they were outside. She said the Defendant came outside with the gun by his side and the barrel pointed at the ground. She said the victim saw the Defendant and walked toward the Defendant. She said the victim told the Defendant that he would kill the Defendant if the Defendant put away the gun. She said the victim did not have anything in his hands and denied telling the police the victim

had an umbrella. She only remembered seeing an umbrella nearby. After being confronted with her statement to the police, she agreed that the victim struck her after the victim forced her outside. She said that after the victim let her go, the victim began to leave but decided to approach the Defendant instead. She said the victim told the Defendant that the Defendant "was going to have to shoot" the victim. She said that when the victim approached the Defendant outside, the victim pointed his finger at the Defendant and yelled at him. She agreed the Defendant shoved the victim and fired his gun. She agreed the victim had his finger in the Defendant's face. She said only two feet separated them.

Ms. Robinson testified that the Defendant had a paralyzed right foot and had undergone multiple surgeries. She agreed the Defendant had difficulty with balance and said he stumbled when he pushed the victim. She agreed she tried to get the victim to leave and said the victim "kept going back" to the Defendant. She said the victim stated three or four times that the Defendant was going to have to kill the victim. She said the Defendant saw the victim grab her by the neck and push her outside, but she did not know if the Defendant saw the victim hit her while they were outside. She agreed that the Defendant pointed the gun at the victim only after the victim "got up in" the Defendant's face and that the Defendant pushed the victim away.

Ms. Robinson's son testified that he was ten years old at the time of the shooting and that the victim picked him up from school early because he had been suspended for fighting. He said the victim took him home, knocked on the door, and called for his mother. He said that his mother came outside and that the victim asked why they could not enter the home. He said that when his mother said she had company, the victim grabbed his mother's neck, took the house keys from her purse, and entered the home. He said he entered the home a few minutes after the victim. He said the Defendant was in his mother's bedroom holding a gun, pointed toward the floor. He said that the victim yelled that the Defendant should shoot the victim and that the Defendant stood still and spoke calmly to the victim.

Ms. Robinson's son testified that his mother and the victim went outside and that he followed behind. He did not recall anyone touching anyone else or the victim's having anything in his hands. He said the Defendant came outside not long after he did. He stated that although the Defendant did not say anything, the victim yelled, "[Y]ou got the gun, shoot me." He stated that the Defendant said there was another way to deal

- 4 -

with the situation but that the victim continued to yell. He said that the victim walked away but then ran up to the Defendant and that the Defendant pushed the victim back. He said it appeared as though the Defendant pushed the victim hard because the victim was bigger than the Defendant. He said the Defendant raised the gun, paused for two seconds, and shot the victim. He said the Defendant entered the home, got his clothes, and walked down the street after the shooting. He said that the Defendant repeatedly said "dang" and that he interpreted this to mean that the Defendant did not want to shoot the victim.

On cross-examination, Ms. Robinson's son testified that the Defendant was at Ms. Robinson's home the day before the shooting. He said the victim had an umbrella the day of the shooting. He said that his mother did not want to let the victim inside the home and that the victim forced his way inside. He said the victim called his mother names and was angry. He agreed the Defendant was calm and said the Defendant stood still in the bedroom doorway. He said the victim stood in the hall and yelled at the Defendant to shoot the victim. He denied that the victim said he would harm the Defendant if the Defendant put away the gun and that the victim threatened to hit or kill the Defendant. He said that the Defendant told the victim to calm down and that there was another way to solve the problem.

Ms. Robinson's son testified that he did not see the victim grab his mother by the neck and force her outside. He said that he went outside after the victim and his mother and that the Defendant came outside about five seconds later. He said that his mother stated that she did not want to "have anymore of this" and that the Defendant stood still and watched. He said that as the victim went to leave, the victim turned around and "rushed up" into the Defendant's face and that the Defendant pushed the victim off the Defendant. He said the victim told the Defendant that the victim was going to hurt the Defendant. He stated that he saw the victim grab his mother by the throat twice, that he worried for her safety, and that he had seen the victim grab his mother before the day of the shooting. On redirect examination, he stated that the victim had an umbrella in his hand while they walked home from his school but that he did not see the umbrella after they got home. He denied seeing the victim touch the Defendant.

Dr. Marco Ross, an expert in forensic pathology, testified that he performed the autopsy of the victim and that the victim was 6'1' tall and weighed 250 pounds. He said the victim was shot in the chest and had an

entrance wound on the left upper chest wall. He concluded that the cause of death was the gunshot wound to the chest.

Memphis Police Officer Kenneth Walcott testified that when he arrived at the crime scene, he saw the victim lying in the street and secured the area. He said that before he left the scene, the police had a description of the Defendant. Memphis Police Officer Anthony Billingsley testified that he searched the area for the Defendant and that he found the Defendant in downtown Memphis the day after the shooting. On cross-examination, Officer Billingsley stated that the Defendant was arrested while at his attorney's office.

The Defendant testified that he and Ms. Robinson had dated periodically since she was eighteen years old. He said he knew she was married but separated at the time of the shooting. He denied staying at Ms. Robinson's home when she and the victim were living together. He said that on February 24, 2009, he stayed overnight at Ms. Robinson's home. He said he and Ms. Robinson always discussed in advance his coming to her home. He said that he remained at the home the following day with Ms. Robinson and stayed the night. The next day, the day of the shooting, the Defendant awoke around 9:30 or 10:00 a.m. and Ms. Robinson awoke when the victim knocked on the door around noon.

The Defendant testified that Ms. Robinson asked who was at the door, got dressed, grabbed her purse, and went outside. He said her brother planned to pick her up to run a few errands around the time the victim knocked on the door. He said he heard "a commotion" and the victim ask why he could not enter the home. He heard Ms. Robinson tell the victim that she had company and that she did not want the victim at her home. He heard the victim and Ms. Robinson arguing for about three minutes and then someone "busting in" the home. He said he stood in the bedroom doorway and saw the victim in the hall. He said the victim said, "[Y]ou got me f----- up, you got this n----- in your house. I got your ass . . . you got a . . . gun, you [are] going to have to use [it] with your b---- a--." He said the victim stated that if the Defendant put away the gun, the victim was going to "f--- [the Defendant] up."

The Defendant testified that he told the victim that there was "another way" to solve the problem "like gentlemen." He said the victim stated that the Defendant was not the only person who had a gun. He said the victim made a telephone call, grabbed Ms. Robinson by the neck and

- 6 -

forced her outside. He said he looked out the window, heard the victim yelling at Ms. Robinson about the Defendant's being there, and heard the victim threaten the Defendant. He stated that he went outside, that the victim approached him, and that the victim told him that if he put away the gun, the victim would "f--- [the Defendant] up." He said the victim was four or five feet from him. He said the victim walked away, continued to yell at Ms. Robinson for having the Defendant in the victim's home, and told the Defendant, "[S]hoot, mother, shoot." He said that the victim ran at him and that the Defendant held his arm out after the victim got too close. He said that although he had a gun in his left hand pointed at the ground, he had not pointed the gun at the victim. He said he only pointed the gun at the victim when he shot the victim. He said the victim was a large man and bigger than he was. He said that at the time of the shooting, he was 5'9' tall and weighed about 200 pounds, and the victim was 6'1' tall and weighed 250 pounds.

The Defendant testified that he shot the victim because he feared being hurt by the victim. He said, "If the opportunity presented itself[,] I just knew this man, after this display, . . . was going to hurt me. Possibly kill me." He said he did not mean to shoot the victim. He said he grabbed his belongings and left. He denied intentionally or knowingly killing the victim. He said he shot the victim because he was in fear for his life.

On cross-examination, the Defendant testified that he never met the victim before the shooting, although he knew the victim was Ms. Robinson's husband. He said his cell phone was on the dresser in Ms. Robinson's bedroom. He agreed he knew it was the victim knocking on the door and said he did not know what the victim was going to do if he saw the Defendant in Ms. Robinson's bedroom. He said he wanted to leave the home but stayed in the bedroom in shock that the victim was there. He said he did not know what he faced outside if he left the home. He said he grabbed his gun when he heard the victim and Ms. Robinson outside "scuffling." He said that when the victim first saw the Defendant, the victim was about ten to twelve feet from the Defendant. He said the victim came into the bedroom and stood in the middle of the room about four or five feet from the Defendant. He denied saying anything to the victim other than that there was a better way to solve the problem.

The Defendant testified that he had been at the home frequently and was familiar with most of the home's layout. He agreed he knew where the doors were located. He said that after the victim pushed Ms. Robinson out

the door, he looked out the window to check on her safety. He said he heard the victim and Ms. Robinson but could not see them. He said he went outside and walked to where he could see the victim and Ms. Robinson. He said he did not call the police or call anyone for help. He stated that he stood in the driveway during the incident and that although he wanted to leave, he stayed because he feared what the victim would do to Ms. Robinson. He said that while he was outside, he only spoke when the victim addressed him. He denied saying anything other than they needed to solve the problem another way and denied speaking to Ms. Robinson.

The Defendant testified that he knew how a gun worked and that he did not know where he aimed the gun when he shot the victim. He denied yelling during the incident and said he entered the home after the shooting to get his belongings. He denied calling the police or an ambulance and said he walked through the yard when he left. He agreed he walked past the victim, who was lying on the ground, and said he did not attempt to help the victim, call the police, or wait for the police to arrive. On redirect examination, the Defendant testified that he put his gun in his pants pocket when the victim knocked on the door and identified himself.

State v. Tommy Gayden, No. W2011-00378-CCA-R3-CD, 2012 WL 5233638, at *1-6 (Tenn. Crim. App. at Jackson, Oct. 23, 2012), perm. app. denied, (Tenn. Mar. 18, 2013). Based upon the foregoing proof, the jury convicted the Petitioner as charged of second degree murder.

Before sentencing, the State filed a notice to seek enhanced punishment, and defense counsel filed a notice of mitigating factors. At the sentencing hearing, the trial court sentenced the Petitioner as a Range II, violent offender to thirty years to be served at one hundred percent.

The Petitioner filed a direct appeal of his conviction to this court. On appeal, he claimed that (1) the evidence was insufficient to support the conviction because he was "acting upon a well-founded fear of death or serious bodily injury, or alternatively, because he acted in a state of passion based on adequate provocation"; (2) the trial court erred by allowing the State to say during its opening statement that he was "calm and collected" at the time of the shooting; (3) the trial court erred by allowing the State to make comments about the effect of the shooting on Ms. Robinson's son during closing arguments; and (4) the trial court erred by not giving his requested jury instruction "that he held a reasonable belief of imminent death or serious bodily injury when deadly force was used against someone who entered the home unlawfully and forcibly" pursuant to Tennessee Code Annotated section 39-11-611(c). Id. at *6, 8, 9, 11.

This court found the evidence sufficient to support the conviction. In concluding that a reasonable jury could have rejected the Petitioner's claim of self-defense, this court noted that the victim never touched the Petitioner, that the Petitioner obtained a gun when he heard the victim at the door and kept the gun in his hand during the entire incident, and that the Petitioner raised his arm straight and shot the unarmed victim after a brief pause. Id. at *7. In concluding that a reasonable jury could have rejected the Petitioner's claim of adequate provocation, this court stated that the evidence supported a finding that the Petitioner was calm during the incident. Id. at *8. This court also held that the State's opening statement was not improper and that the Petitioner was not entitled to his requested jury instruction. Id. at *9, 13. Although this court found that the State's closing arguments about Ms. Robinson's son were improper, this court noted that trial counsel did not request a mistrial and concluded that the error was harmless. Id. at *11.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief, claiming that he received the ineffective assistance of counsel because trial counsel did not request a mistrial when the State made its improper closing arguments. The post-conviction court appointed counsel, and post-conviction counsel filed amended petitions, adding, in pertinent part, that trial counsel were ineffective for not requesting a mistrial when "the state made two objectionable and improper arguments during closing and rebuttal argument forcing the [trial court] to give a curative instruction"; for not properly investigating the victim's violent nature and past history of violence; for not communicating with the Petitioner about trial preparation or defense strategy; and for not investigating the case properly.

The trial transcript reflects that the Petitioner had two attorneys: lead counsel and co-counsel. Lead counsel did not testify at the post-conviction evidentiary hearing. Co-counsel testified for the Petitioner that he became licensed to practice law and went to work for lead counsel's law firm in 2009. Co-counsel "had minimal dealings" with the Petitioner's case prior to the 2010 trial and "simply helped [lead counsel] with the case and made sure that . . . the file was together." Co-counsel was not involved in the discovery process but researched an issue involving "the self-defense presumption." Co-counsel did not think he ever met with the Petitioner before trial, but he and lead counsel met with the Petitioner every morning during the trial "and then during the recesses and whatnot." After the jury convicted the Petitioner, co-counsel wrote the Petitioner's appellate brief and argued the appeal to this court.

Co-counsel testified that the Petitioner's case was "a first aggressor type of defense" but that he did not know if lead counsel researched the victim's reputation for violence. Regardless, the State's proof showed that the victim was the first aggressor

because he forced his way into Ms. Robinson's home, put his hands on her, and verbally confronted her and the Petitioner. Co-counsel explained, "And so I don't know that we had planned on going into [the victim's] propensity [for violence] necessarily because there was already proof in the record that he was violent at that instance." Co-counsel said he thought lead counsel "started down that road" when lead counsel began cross-examining Ms. Robinson's son about the victim's relationship with Ms. Robinson. The State objected, though, and trial counsel "made a judgment call" not to pursue that line of questioning because it could have opened the door to the Petitioner's violent background. The defense did not make an offer of proof regarding Ms. Robinson's son's testimony.

Co-counsel testified that he and lead counsel explained to the Petitioner what was going on during the trial and that the Petitioner was active in the trial strategy. Co-counsel cross-examined only one of the State's witnesses, and lead counsel cross-examined the remaining witnesses. During the State's closing arguments, trial counsel objected to the State's improper argument about Ms. Robinson's son. The trial court sustained the objection and gave a curative instruction, so trial counsel did not request a mistrial. Lead counsel used a private investigator for murder cases, but co-counsel did not know if the private investigator worked on the Petitioner's case.

On cross-examination, co-counsel testified that he was present every day during the trial and that he did not remember having any difficulties communicating with the Petitioner. The Petitioner was "frustrated with the situation he was in" but was not critical or angry with lead counsel or co-counsel. The defense's strategy was that the Petitioner shot the victim in self-defense and in defense of Ms. Robinson, and lead counsel questioned Ms. Robinson at trial about the victim's actions before the shooting. Lead counsel stopped questioning Ms. Robinson's son about the victim's relationship with Ms. Robinson because "it became apparent that the State could go into the defendant's history of violence." Because this was a self-defense case, trial counsel did not want to open the door to the Petitioner's having a prior conviction for voluntary manslaughter.

Michael Dickerson, the Petitioner's older brother, testified that seventy percent of the payment for the Petitioner's defense "fell on" him. He and his family knew lead counsel well prior to the shooting because lead counsel had represented the family for "about five generations." Dickerson described lead counsel as a "fixture" in the family and said that the family trusted and depended on lead counsel. Dickerson had a difficult time contacting lead counsel by telephone, so he would "just show up" at lead counsel's office occasionally to make a payment and ask about the Petitioner's case.

Dickerson testified that he was present every day of the Petitioner's trial and that lead counsel was not "at his best." Lead counsel referred to the victim by the wrong

name and seemed more dependent on co-counsel than lead counsel's "own natural abilities." Dickerson said that his family loved lead counsel "dearly" but that lead counsel was "older" and "slower." Lead counsel was not his usual "perky self" and "just wasn't the man that [they] were used to seeing."

Dickerson testified that Felicia Robinson was a "very nice girl" and had been in a relationship with the Petitioner "off and on" for more than twenty years. Dickerson said that he did not know the victim personally but that the victim had a reputation as "a bully kind of fellow." Lead counsel knew about the victim's reputation, and Dickerson told lead counsel that he needed to bring out at trial that the victim attacked the Petitioner. Dickerson said that the victim "came there with his mindset that somebody [was] going to die," that the victim was "out of order," and that the Petitioner "fired one shot to stop this man." The Petitioner was not a person who showed a lot of emotion and usually "kept his cool."

Felicia Robinson testified that at the time of the shooting, she and the victim were married but separated due to "[c]ontrol issues" and physical and verbal abuse. Ms. Robinson had told the Petitioner about some of the abuse, and the Petitioner was aware of the victim's violent tendencies. At trial, Ms. Robinson felt torn between the Petitioner's and the victim's families. She talked with the prosecutors before trial and felt pressured by them to say negative things about the Petitioner. No one from lead counsel's office spoke with Ms. Robinson or her son before trial. Ms. Robinson spoke with lead counsel during the trial, but he did not prepare her for trial. She and lead counsel discussed her abusive relationship with the victim, but she did not get to testify much about the abuse.

Ms. Robinson testified that on the day of the shooting, the victim took her keys out of her purse, went into her house, and walked toward her bedroom in the back of the house. The Petitioner was already standing in the doorway, and the victim was cursing, "going off," and "wanting to fight" the Petitioner. The Petitioner was holding a gun. Ms. Robinson stated that the victim told the Petitioner to put the gun down and that the victim said he was going to do "this and that" to the Petitioner. The Petitioner did not do anything to the victim and did not argue with him. The victim pulled Ms. Robinson out of the house and pushed her head. Ms. Robinson was scared and tried to get him to leave, but he refused. By that time, the Petitioner also was outside. Ms. Robinson said that the victim "went up in [the Petitioner's] face" and that they were probably less than five feet apart. The Petitioner "pushed him back and shot him."

Ms. Robinson testified that she thought lead counsel "didn't allow important things to be shared" with the jury. Specifically, Ms. Robinson did not get to say at trial that the Petitioner did not want to shoot the victim.

- 11 -

On cross-examination, Ms. Robinson acknowledged that she testified at trial that the victim was the aggressor, that he took her keys and purse, and that he came into her house without her permission. However, she did not get to "express" at trial that the Petitioner's reaction to the victim was not violent and that the Petitioner was trying to be calm. She acknowledged that the Petitioner's shooting the victim was a "pretty violent" act.

The Petitioner testified that he learned about a warrant for his arrest the day after the shooting and that he turned himself in to lead counsel at lead counsel's office. The "fugitive squad" arrived a few minutes later, arrested the Petitioner, and took him to jail. Lead counsel told the Petitioner not to give a statement to the police, so the Petitioner never spoke with law enforcement. Lead counsel and the Petitioner talked about the shooting "some" in lead counsel's office and in jail, but they "never did get to finish." The Petitioner's bond was set too high for him to be released from confinement. On the day of his preliminary hearing, lead counsel told him that he was going home. However, "it didn't turn out like that," and the Petitioner remained in jail.

The Petitioner testified that lead counsel "seemed like he was disconnected from the start." The Petitioner never received discovery, and lead counsel never went over discovery materials with him. One time, lead counsel told the Petitioner that "it don't look good that you're [gang] affiliated." Lead counsel's statement "kind of throwed" the Petitioner because the Petitioner had never been a gang member. The Petitioner thought lead counsel was talking about a different defendant or the wrong case. Lead counsel told the Petitioner that he had talked with Ms. Robinson. However, the Petitioner did not think lead counsel hired an investigator or talked with the Petitioner's family. The Petitioner received letters from lead counsel, stating that Ms. Robinson had changed her statement and that the State had made an offer of twenty-five years. The Petitioner was forty-years old, so the offer was like a life sentence. Lead counsel asked the Petitioner what he wanted to do. The Petitioner told lead counsel that he wanted to go to trial, and lead counsel responded, "[G]ood for you."

The Petitioner testified that on three occasions, lead counsel asked him, "[W]here's my [motherf------] money?" The Petitioner told lead counsel to speak with the Petitioner's family about it. The Petitioner learned from his family that he had "a zero balance," so he thought his account with lead counsel had been paid in full. The Petitioner said that he and lead counsel never discussed trial strategy and that he told lead counsel to "check into" the victim's history. However, lead counsel never responded to the Petitioner.

The Petitioner testified that he and lead counsel did not discuss the trial before the trial date. During the trial, they talked in the lock-up area in the back of the courtroom.

Lead counsel told the Petitioner that "whatever you do, don't show no expression." Therefore, the Petitioner did not show any facial expressions even though he was feeling "all kinds of emotion." The Petitioner had a prior conviction for voluntary manslaughter, and he and lead counsel discussed whether his criminal history should be admitted into evidence. Although lead counsel did not want the jury to hear about the conviction, the Petitioner said at the evidentiary hearing that "it wouldn't have made much of a difference." The Petitioner testified on his own behalf at trial, but lead counsel did not prepare him for his testimony. Lead counsel told the Petitioner, "[Y]ou have to be careful what you say in order to avoid bringing in your background." The Petitioner was careful during his testimony and did not speak "badly" of the victim. The Petitioner saw lead counsel "dozing off" at trial, and lead counsel was "really disconnected" from the Petitioner. The Petitioner said lead counsel was not "strong with his questioning" of the witnesses, "cowarded down," and did not "follow through" on most of his objections and questions.

The Petitioner testified that lead counsel never addressed his character at sentencing. The Petitioner was employed as a truck driver, was participating in a program called Stop the Violence, and was taking responsibility for his child support before the shooting. Although he had a prior drug conviction, he had stopped selling drugs. Lead counsel did not bring up any of those factors at sentencing. Regarding allocution, lead counsel simply told the Petitioner to "state your case to the Judge."

The Petitioner testified that he never got to say "fully" at trial what happened with regard to the shooting. The Petitioner had heard from Ms. Robinson's friends that the victim "had jumped on her before." A couple of days before the shooting, Ms. Robinson's uncle told the Petitioner that the victim was "about to explode." The Petitioner asked Ms. Robinson if he had anything to worry about, and she told him no because "I asked you to come over here."

The Petitioner testified that on the day of the shooting, he heard the victim and Ms. Robinson outside. The Petitioner wanted to leave but stayed because he did not know what would happen to Ms. Robinson. The victim came into the house, saw him, and said, "'You got this [motherf-----] over here?'" The Petitioner had a gun in his left hand but kept it pointed down. The victim grabbed Ms. Robinson by her neck and forced her outside. The Petitioner and Ms. Robinson's son also went outside, and the victim let go of Ms. Robinson. The victim came toward the Petitioner and said, "'Man, you put that gun down, I'll [f---] you up.'" The Petitioner responded, "'I'm going to make you shoot me, [B----].'" The victim went back to Ms. Robinson and put his hand on her neck, and the Petitioner told the victim that "'it ain't got to be this way.'" The Petitioner stated that he was not calm but that he "wasn't acting outrageous" and that he was hoping to "talk [the victim] down." However, the Petitioner thought the victim was going to hurt him "in

the worst way" if the victim got the chance. The Petitioner also thought the victim was going to beat Ms. Robinson if the Petitioner left. The Petitioner said that the victim "ran up on" him, that he stumbled backward, and that he "came up" and shot the victim. He acknowledged that if he had testified the way he had wanted to at trial, his prior conviction of voluntary manslaughter would have been admissible.

On cross-examination, the Petitioner acknowledged that his defense was that he was acting in self-defense and in defense of Ms. Robinson. He also acknowledged that Ms. Robinson testified at trial that the victim was being verbally abusive, threatening, and aggressive and that the victim was the aggressor on the day of the shooting. The Petitioner said he did not get to testify at trial about his demeanor at the time of the shooting. Although the State claimed at trial that he was calm and collected, the Petitioner never got to say "what was going on, on the inside." The Petitioner went outside on the day of the shooting to make sure the victim was not hurting Ms. Robinson, and the Petitioner tried "to talk the situation down." The Petitioner took a gun outside with him but left his cellular telephone inside the house. He did not call 911 before he shot the victim.

The Petitioner testified that he wanted lead counsel to ask Ms. Robinson at trial what the victim said he would do to her if he caught her with someone else. However, the Petitioner acknowledged that Ms. Robinson's testimony would have been hearsay. The Petitioner also wanted other people to testify at trial about the victim's violent past. Lead counsel did not tell the Petitioner that if the defense went into the victim's violent history, the prosecution could talk about the Petitioner's violent history. The Petitioner followed lead counsel's advice so as not to open the door to his conviction for voluntary manslaughter, and the jury never heard about the conviction. The Petitioner said he did not know lead counsel filed a notice of mitigating factors before sentencing.

On redirect examination, the Petitioner testified that he never pushed the victim and "only blocked him." The Petitioner also did not raise his arm and hold it with the intent to kill the victim. The victim never stopped yelling or being aggressive prior to the shooting, and the Petitioner shot the victim to protect himself. The Petitioner said that "[w]ith everything going on, [he] didn't think much about the police."

In a written order, the post-conviction court denied the petition for post-conviction relief. First, the court addressed the Petitioner's claim that trial counsel was ineffective for failing to investigate the victim's violent nature and past history of violence. The court stated that "it was uncontroverted that the victim was the first aggressor" on the day of the shooting. The court found that if the Petitioner had presented proof of the victim's violent nature and character pursuant to Tennessee Rule of Evidence 404(a)(2), then the State could have presented proof of the Petitioner's own violent nature, particularly his

prior conviction for voluntary manslaughter, under Tennessee Rule of Evidence 404(a)(1). The post-conviction court stated that evidence of the Petitioner's conviction would have been extremely damaging to his case with little benefit because the victim's role as the first aggressor prior to the shooting was never in doubt. The court stated that although the defense initially planned to introduce evidence of the victim's propensity for violence, trial counsel made a strategic decision not to pursue the evidence so as not to open the door to the Petitioner's criminal history. The post-conviction court described trial counsel's decision as "a wise one" and concluded that the Petitioner was not entitled to relief.

Next, the post-conviction court addressed the Petitioner's claim that trial counsel was ineffective because counsel failed to communicate with him about trial preparation or defense strategy. The Petitioner acknowledged at the evidentiary hearing that trial counsel's trial strategy was to show he acted in self-defense and in defense of Ms. Robinson. The post-conviction court found that the Petitioner "has not suggested how any better communication or preparation would have resulted in a different or better defense." As to the Petitioner's claim that trial counsel was ineffective for failing to investigate the case properly, the post-conviction court stated that the Petitioner failed to suggest what more counsel should have done or what information counsel could have obtained that would have made a difference at his trial or in his defense strategy. Finally, the post-conviction court addressed trial counsel's failure to object to the State's improper closing arguments about Ms. Robinson's son and concluded that the trial court would have denied a request for a mistrial because the trial court gave a curative instruction to the State's improper arguments. At the conclusion of its order, the post-conviction court stated that it did not notice a "'slowing down'" of lead counsel or that lead counsel "'dozed off'" during the trial. The post-conviction court concluded that the Petitioner failed to demonstrate that he received the ineffective assistance of counsel. On appeal, the Petitioner challenges the court's denial of the petition.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are

- 15 -

entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

## A. Victim's Violent History

The Petitioner contends that trial counsel were ineffective for failing to make offers of proof at trial about the victim's reputation for violence in the neighborhood and the victim's prior acts of abuse toward Ms. Robinson because the evidence would have supported his claim of self-defense and defense of another. Specifically, the Petitioner asserts that Ms. Robinson and her son should have testified about the victim's prior acts of abuse toward Ms. Robinson in order to show the victim was the first aggressor and that the Petitioner should have testified that Ms. Robinson told him the victim had been physically abusive to her in the past in order to show the Petitioner feared the victim.

As to offers of proof regarding the victim's prior acts of abuse toward Ms. Robinson, Ms. Robinson and her son testified on direct and cross-examination at trial that the victim was the first aggressor before the shooting. The post-conviction court found, and we agree, that the victim's role as the first aggressor was never in doubt. Therefore, the Petitioner has failed to establish that trial counsel was ineffective with regard to the proposed testimony of Ms. Robinson and her son.

As to an offer of proof by the Petitioner to show he feared the victim, "There is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995). When a defendant's fear of the victim is relevant and the defendant is aware of the prior acts, the defendant can testify about his knowledge of the victim's violent conduct. State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994) (citing Williams v. State, 565 S.W.2d 503, 505 (Tenn. 1978)).

The State argues that if the Petitioner had testified about his knowledge of the victim's prior acts of abuse against Ms. Robinson, then the Petitioner would have opened the door to his own violent nature pursuant to Tennessee Rule of Evidence 404(a). We disagree. Tennessee Rules of Evidence 404(a)(1) and (2) provide that if an accused places the victim's character for violence at issue, then the State may offer evidence about the accused's character for violence to rebut the same. The Petitioner is not arguing that he should have been allowed to testify that the victim was a violent person and was acting in conformity with a propensity for violence on the day of the shooting but that he was afraid of the victim because he knew the victim had abused Ms. Robinson previously. In other words, he wanted to show his state of mind at the time of the shooting. Therefore, Rule 404(a) does not apply. See State v. Garry Baker, No. M2016-01164-CCA-R3-CD, 2017 WL 1534993, at *8 (Tenn. Crim. App. at Nashville, Apr. 28, 2017).

That said, we conclude that the Petitioner is not entitled to relief. We have carefully reviewed the Petitioner's evidentiary hearing testimony. The Petitioner testified that the victim "was more mad than I could ever imagine a man could be at that time" and that "if [the] opportunity presented itself, he was going to hurt me in the worst way." However, he never testified at the hearing that he feared the victim because he knew the victim had physically abused Ms. Robinson. In fact, he never testified at the hearing that he feared the victim at all. To the contrary, the evidence at the hearing showed that the Petitioner knew the victim and Ms. Robinson were still married but that he dated her anyway and frequently spent the night at her home. Although Ms. Robinson's friends had told him that the victim had "jumped on" Ms. Robinson previously and her uncle told him just a few days before the shooting that the victim was "about to explode," the

Petitioner again spent the night with her. When the victim arrived at Ms. Robinson's house on the day of the shooting, confronted the Petitioner, and told him that I'll [f---] you up,'" the Petitioner responded, "'I'm going to make you shoot me, [B----].'" The Petitioner appeared calm, not afraid, throughout the incident. Therefore, we conclude that the Petitioner failed to demonstrate that counsel was deficient or that he was prejudiced by any deficiency.

## B. State's Closing Arguments

Next, the Petitioner contends that trial counsel should have objected or requested a mistrial when the prosecutor repeatedly used the word "hitman" during the State's closing argument. As noted by the State, though, the Petitioner did not raise this issue in his petition for post-conviction relief and did not ask co-counsel about it at the evidentiary hearing. Accordingly, the post-conviction court did not address it in the court's order denying the petition for post-conviction relief. We conclude that the issue has been waived. See State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996).

## C. Petitioner's Prior Conviction

The Petitioner contends that trial counsel was ineffective for not discussing with him whether his prior conviction of voluntary manslaughter should come into evidence at trial and for not attempting to preclude the conviction from evidence pursuant to Tennessee Rule of Evidence 404(b). However, as noted by the State, the Petitioner testified at the evidentiary hearing that he and lead counsel discussed whether his criminal history should be admitted and that lead counsel did not want the jury to learn about his voluntary manslaughter conviction. Moreover, the Petitioner said lead counsel told him to "be careful" during his testimony so as not to open the door to his criminal history and that he followed lead counsel's advice. Therefore, we find no merit to the Petitioner's claim that trial counsel was ineffective for not discussing his voluntary manslaughter conviction with him.

The Petitioner claims that trial counsel should have attempted to exclude his prior conviction from evidence pursuant to Tennessee Rule of Evidence 404(b), which prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. However, even if trial counsel had argued, and the trial court had agreed, that the Petitioner's voluntary manslaughter conviction was inadmissible under Tennessee Rule of Evidence 404(b), a witness can still open the door to the State's questioning the witness about the conviction. See State v. Rodney Jennings, No. E2017-00330-CCA-R3-CD, 2018 WL 1168723, at *13 (Tenn. Crim. App. at Knoxville, Mar. 6, 2018), perm. app. denied, (Tenn. June 6, 2018) (although trial court ruled evidence of defendant's prior

- 18 -

conviction for domestic assault was inadmissible under Rule 404(b), defendant opened the door to the evidence during his direct testimony). The evidentiary hearing testimony demonstrates that trial counsel made a strategic decision not to do anything that might open the door to the Petitioner's prior conviction. Although the Petitioner claimed at the hearing that the jury's hearing about his conviction "wouldn't have made much of a difference," this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Therefore, we conclude that that the Petitioner has failed to show that counsel's performance was deficient or that he was prejudiced by any deficiency.

### D. Cumulative Errors

Finally, the Petitioner contends that he was prejudiced by trial counsel's cumulative errors during the course of the trial. He claims that those cumulative errors included trial counsel's failure to hire an investigator to interview witnesses and investigate the victim's violent reputation, failure to prepare him to testify at trial so that he "could have an understanding of any potential implications of a jury hearing his prior criminal history," and failure to prepare him or any witnesses to testify at sentencing.

As found by the post-conviction court, the Petitioner failed to present any additional evidence that an investigation would have revealed that would have made a difference at his trial. Furthermore, the Petitioner testified that he and lead counsel discussed his prior conviction of voluntary manslaughter during the trial and that lead counsel told him to be careful so as not to open the door to that conviction. The Petitioner was careful during his testimony, and the jury did not hear about his conviction. He has failed to explain what more trial counsel should have done to prepare him for his testimony, and he has failed to demonstrate that counsel's not preparing him prejudiced his case.

Regarding sentencing, the Petitioner failed to present any witnesses at the evidentiary hearing that could have testified on his behalf at the sentencing hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Moreover, our review of the trial record confirms that trial counsel filed a notice of mitigating factors, and the Petitioner has failed to explain on appeal what evidence trial counsel could have presented at sentencing that would have changed his sentence. Accordingly, he has failed to show that he is entitled to post-conviction relief.

### III. Conclusion

- 19 -

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE